Steven C. Dawson, SBN # 006674
Anita Rosenthal, SBN # 006199
Sander R. Dawson, SBN #032243
DAWSON & ROSENTHAL, P.C.
25 Schnebly Hill Road
Sedona, Arizona 86336-4233
Telephone (928) 282-3111
Facsimile (928) 282-3126
e-mail:  dandr@dawsonandrosenthal.com

*Attorneys for Plaintiff*

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TODD PETERS, an individual,<br><br>              Plaintiff,<br><br>vs.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>              Defendant. | **CASE NO.**<br><br>**COMPLAINT FOR DAMAGES & REQUEST FOR JURY TRIAL** |

Plaintiff, Todd Peters (hereinafter "Mr. Peters" or "Plaintiff"), through undersigned counsel, hereby files his Complaint and alleges as follows:

## I.       PARTIES, JURISDICTION AND VENUE

1.  Plaintiff, Todd Peters is a resident of Arizona residing in Paradise Valley, Arizona within the District of Arizona.

2.  Prudential Insurance Company of America (hereinafter "Prudential" or "Defendant") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 751 Broad Street, Newark, New Jersey.

3.  Prudential Insurance Company of America (hereinafter "Prudential" or ("Defendant") is an insurance company licensed and authorized to do business in Arizona

and which is domiciled in the State of Arizona.

4. Prudential is subject to the insurance holding company laws in the states where its insurance subsidiaries are domiciled, which currently includes Arizona.

5. Prudential has intentionally availed itself of the benefits and protections of Arizona. Prudential and/or its subsidiaries own real estate in Arizona and operates its business within Arizona for the purpose of maintaining and administering long-term disability insurance policies. Prudential operates insurance sales offices in Arizona, including, but not limited to, the sale of long term disability insurance policies.

6. Mr. Peters' long term disability insurance claim is not governed by or subject to the Employee Retirement Income Security Act of 1974 and is subject to Arizona law.

7. There is Complete diversity between the parties and, as alleged below, the amount in controversy exceeds $75,000.00. This court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a)(1).

## II.   UNDERLYING FACTS

8. At all times relevant hereto, Plaintiff Todd Peters' occupation was that of President and Chief Executive Officer of GENCO, A FedEx Company.

9. In or about 1990, Mr. Peters applied for long term disability coverage under the American Institute of Certified Public Accountants Insurance Trust ("AICPA").

10. The AICPA sponsors and maintains a group insurance trust entitled the "The American Institute of Certified Public Accountants Insurance Trust".

11. As of April 5, 2011, Bank of New York Mellon has been the trustee of the AICPA Insurance Trust.

12. The AICPA Trust contracted with Prudential to provide long term disability insurance coverage for its members under group policy number GZ-14273 (hereinafter, the "Policy"). A true and correct copy of the Policy is attached as **Exhibit 1** and incorporated herein by reference.

13. Mr. Peters has been continuously insured under the Policy since in or about

1   1990, and has paid all premiums due.

2       14. The Policy provides disability benefits starting the day after the 13th week

3   of continuous disability.

4       15.  In relevant part, the term "disability" is defined by the Policy as the inability

5   to perform, for wage or profit, the material and substantial duties of your own occupation

6   while under the regular care of a doctor and not working at any job for wage or profit.

7       16. The Policy defines "material and substantial duties" as those duties "that are

8   normally required for the performance of your own occupation and cannot be reasonably

9   omitted or modified."

10      17. "Own occupation" is defined by the Policy to mean "the occupation you are

11  routinely performing when your disability occurs."

12      18.  Under the Policy, Mr. Peters' was enrolled for the maximum monthly

13  benefit of $12,000 per month.

14      19. The material and substantial duties of Mr. Peters' occupation as President

15  and Chief Executive Officer of GENCO were both cognitively and physically challenging.

16  The material and substantial duties of Mr. Peters' occupation required exceptional

17  organizational, reading and communication skills, cerebral dexterity, memory and

18  tremendous mental and physical stamina to withstand the intense pressure of running a

19  subsidiary of a "Fortune 100" company, with approximately 14,000 employees, in a very

20  competitive environment. During a typical week,  Mr. Peters would invest time working

21  on each of the 12 main components of  his occupation: 1) setting commercial strategy &

22  direction, 2) modeling and setting the company culture, 3) building and leading the senior

23  team, 4) securing and allocating capital, 5) leading major sales and solutions projects, 6)

24  developing and improving relations with major customers and prospects, 7) regulatory

25  compliance, 10) financial reporting and accountability, 11) public relations and 12) travel.

26      20.  Typically, Mr. Peters would work 55 hours a week, not including his on-call

27  time and travel time that could include ten to fifteen flights a month.

28
                                        3

21.  On June 23, 2015, Mr. Peters suffered a significant, debilitating, and life altering stroke from which he would never completely recover.

22. Specifically, Mr. Peters suffered a cryptogenic lacunar infarct of left lateral aspect of the cerebellar vermis. Among other things, the cerebellar vermis is responsible for processing visual, auditory, and balance information sent to it from the relevant organs in the body.

23.  On that date, he was in GENCO's Pittsburgh office on the phone with a staff member at 5:30 p.m.

24.  At that point, Mr. Peters began to feel light-headed and dizzy. Another staff member in Mr. Peters' office put the phone on hold and called a co-worker for help.

25.  Mr. Peters suffered from severe nausea and hyperhidrosis.

26.  Mr. Peters recalls being wheeled to a waiting ambulance and recalls nothing more of that day or evening.

27.  On or about midnight of June 24, 2015, Mr. Peters regained consciousness at the University of Pittsburgh Medical Center St. Margaret's Emergency Department, whereupon he was advised that he had suffered a stroke.

28.  While confined to University of Pittsburgh Medical Center from June 23, 2015 until July 3, 2015, Mr. Peters was under the primary care of Neurologist, Dr. Maxim Hammer.

29. Mr. Peters suffered from profound visual disturbances, significant fatigue, light sensitivity, loss of balance, vertigo, a lack of coordination, and extreme mental fogginess

30.  Prior to his release, Mr. Peters underwent extensive rehabilitation therapy at the University of Pittsburgh's Mercy Stroke Rehabilitation Unit where he learned to walk properly again, and underwent significant speech and occupational therapy, including how to once again place canned goods on shelves and fold towels.

31. Mr. Peters was released from the University of Pittsburgh Medical Center

on July 3, 2015, even though he still suffered from difficulty seeing straight, significant fatigue, light sensitivity, loss of balance, vertigo, a lack of coordination, and significant mental fogginess.

32.  On or about July 16, 2015, approximately two weeks after being released from the hospital, Mr. Peters unsuccessfully attempted a gradual return to his occupation.

33. Mr. Peters found that he could no longer multitask as he had done before, and that tasks that would have taken him a relatively short time to perform prior to his disability were taking him significantly and unacceptably longer to complete.

34. During his attempt to return to his occupation Mr. Peters would typically spend two to three hours at the office, become exhausted, and call his wife to drive him home.

35.   From July 16, 2015, through to his last day of work on September 18, 2015, Mr. Peters was never able to work a full day or a full week.

36. Due to his persistent mental fogginess, fatigue with the slightest cognitive exertion, and other sequelae of his stroke, Mr. Peters could not continue to perform the material and substantial duties required of the President and CEO of GENCO. A new CEO of GENCO was named on September 1, 2015, and Mr. Peters stopped working on September 18, 2015, after completing a short transition period.

37. Mr. Peters provided Prudential with timely notice of claim by correspondence dated January 4, 2016.

38. By Express Mail dated January 27, 2016, Mr. Peters provided Prudential with the following proofs of loss:

• Psychotherapy Notes Authorization;
• A Medical Authorization;
• An Employee Statement Proof of Loss form;
• An Occupational Description;
• A Schedule of his Physicians;
• The Medical Records of Dr. Max Hammer;
• The Medical Records of Dr. Michael Finikiotis; and

5

1

• The Medical Records of Dr. Patricia Showerman.

2

39. By correspondence dated March 7, 2016, Mr. Peters provided Prudential

3

with Dr. Maxim Hammer's February 26, 2016, Attending Physician's Statement and

4

medical records.

5

40. Dr. Hammer's February 26, 2016 Attending Physician Statement stated that

6

Mr. Peters' "[s]troke has caused him to have difficulty with mental concentration and

7

stamina, which renders him incapable of performing his job as CEO."

8

41. Dr. Hammer's September 21, 2015, office note attached to the March 7,

9

2016 correspondence provided:

10

11

> We discussed his ability to perform his job as CEO of a
> company. The effect of the stroke is that he has diminished
> stamina, has constant vertigo (it was a midline cerebellar
> stroke) and cannot focus his attention and has decreased short
> term memory. . .

12

13

14

> * * *

15

> My overall impression is that Mr. Peters is stable from a
> neurovascular standpoint.  He had a pinpoint cerebellar stroke
> that has permanently injured the cerebellar vermis.  The natural
> consequence of this type of stroke is vertigo and difficulty with
> mental concentration.  Because of how high functioning he was
> prior to the stroke, as CEO of a major company, I feel that there
> is no way he can perform at his previous level.

16

17

18

19

20

42. By Correspondence dated April 20, 2016, Mr. Peters' provided Prudential

21

with detailed responses to its questions regarding his activities of daily living and provided

22

Prudential updated medical records.

23

43. By correspondence dated April 19, 2016 and received by Mr. Peters on

24

April 22, 2016, Prudential advised that it is "[u]nclear why Dr. Hammer indicates Mr.

25

Peters is unable to return to work," and gave Mr. Peters' 45 days to obtain

26

neuropsychological testing to support his claim.

27

44. By correspondence dated May 31, 2016, Mr. Peters provided Prudential

28

with the May 20, 2016, report of his Clinical Neuropsychological Evaluation by Dr. Richard Weiss, Ph.D., L.P.C.

45. Dr. Weiss' report stated, *inter alia*:

> [p]resented [with] severe impairment as related to his ability to maintain attention. It is also noted that his ability to attend to and process a continuous flow of information is impaired (as per borderline performance on his recall of information contained in a series of short stories). Additionally, he made errors on relatively simple mathematics problems. Examination results are consistent with critical focal pathology that has disrupted processes necessary
> for maintaining functional attention and vigilance.
>
> ***
> During the course of the examination it was observed that Mr. Peters experienced difficulty sustaining mental stamina.
>
> ***
> As per interview results, there is evidence of behavioral changes that have occurred since the stroke, these including outbursts, diminished social sensitivity in certain situations, impulsivity, and a fear of leaving the country. As noted, increased caution is a symptom some individuals manifest after sustaining a stroke.

46. Dr. Weiss concluded:

> I have read Mr. Peters' job description as related to his position of President and CEO of Genco. It is clear that his responsibilities required high levels of sustained attention, mental stamina, information processing speed and skill, decision-making, and interpersonal sensitivity. Results of the neuropsychological examination indicate that Mr. Peters is incapable of sustaining the level of attention necessary to return to his former employment. Additional concerns include mental fatigue, incidents of forgetfulness, careless errors, and diminished processing speed. I concur with Dr. Hammer's assessment that Mr. Peters is incapable

of functioning at his previous level.

47. By correspondence dated June 1, 2016, Prudential requested an additional thirty days to determine whether Mr. Peters, a stroke victim with objective proof of his disabling cognitive dysfunction, could perform the material and substantial duties of his occupation as a President and CEO of a Fortune 100 company subsidiary.

48. By correspondence dated July 15, 2016, Prudential advised that it would take yet another thirty days to evaluate Mr. Peters' claim.

49. In a report dated July 21, 2016 and commissioned by Defendant, Michelle Zeller, Psy.D., ABPP/CN, detailed her review of Mr. Peters' medical records and neuro-psychological evaluation.   In relevant part, Dr. Zeller stated:

> Based on the documentation reviewed, Mr. Peters has medically necessary restrictions and limitations from cognitive symptoms from September 1, 2015 forward.
>
> ***
>
> Prior to his stroke, Mr. Peters was working in a highly stressful position as the CEO and President of GENCO. with thousands (14,000 according to Mr. Peters' report to Dr. Camiolo Reddy in June 2015) of people working under him and frequent air travel. The stress of this position would likely exacerbate his Adjustment Disorder (which could also elevate his blood pressure and increase his risk for another stroke[sic]. As a result, Mr. Peters would benefit from being restricted to a position with less responsibility. Mr. Peters should be restricted to 40 hours per week (starting part-time and gradually working up to full-time).
>
> * **
>
> Mr. Peters has limitations secondary to his cognitive symptoms. For instance, his slowed processing speed will result in his requiring extra time to meet deadlines, process information and complete tasks. Deficits in attention and vigilance will cause him to be easily distracted. As a result, he may be prone to making careless errors and fail to encode information. The latter will likely result in impaired recall. Mr. Peters will likely be easily distracted and require information to be presented numerous times.

50. On July 26, 2016, Prudential employee Cynthia Rodriguez noted in Prudential's "SOAP" notes that Prudential would accept liability on Mr. Peters' claim. At that same time, the claim was assigned to "Segment #3" and it was noted that Prudential would pay Mr. Peters' claim through to July 31, 2017.

51. On information and belief, it was at this point that Prudential resolved to deny Mr. Peters' claim, despite its merits, by July 31, 2017, to save itself money.

52. "Segment #3" is one of four potential Segments or "flight paths" in Prudential's claims management operations. Claims assigned to "Segment #3" have been designated for aggressive handling and termination.

53. By correspondence dated July 27, 2016, Prudential accepted liability for Mr. Peters' claim and, thereby, admitted that Mr. Peters could not perform the material and substantial duties of his occupation as President and Chief Executive Officer of GENCO.

54. The July 27, 2016, letter further advised that Prudential would pay monthly benefits, retroactive to December 21, 2015.

55. On January 3, 2017, Prudential employee Amy Small was assigned to be the Claim Manager for Mr. Peters' claim.

56. By correspondence dated February 1, 2017, Mr. Peters provided Prudential with his updated medical records from his primary treating Arizona neurologist at the Mayo Clinic, Dr. Maria Aguilar, along with his cognitive rehabilitation treatment records from Behavioral Resources and Institute for Neuropsychological Services.

57. Dr. Aguilar's October 25, 2016, office note documented Mr. Peters' continued symptoms of cognitive problems, difficulties with short term memory and multitasking, lack of a social filter, and imbalance.

58. Dr. Aguilar further noted that Mr. Peters was to have another neuropsychological evaluation in late 2017.

59. The treatment records from Behavioral Resources and Institute for Neuropsychological Services documented that Mr. Peters had "distractible" concentration

and attention, impaired short term memory, poor decision-making, and was impulsive to the extent that it impacted his decision making and social interactions.

60.  On March 28, 2017 Mr. Peters was evaluated by Dr. Yonas Geda due to his continued post-stroke irritability, perseveration, impulsivity, and socially inappropriate conduct.

61. Dr. Geda found that Mr. Peters was having difficulty finding the names of every day objects and had difficulty sequencing, organizing, set shifting, and continued to perseverate. Dr. Geda diagnosed Mr. Peters as suffering from cerebellar cognitive affective syndrome.

62.  By correspondence dated February 8, 2017, Mr. Peters provided Prudential with his medical records dating from his first consult with Dr. Aguilar on March 30, 2016. Those records also noted Mr. Peters' continued cognitive dysfunction and unusual and impulsive behavioral patterns.

63.  By correspondence dated March 15, 2017, Prudential requested that Mr. Peters submit to a neuropsychological evaluation within the next two months.

64.  Five days thereafter, Mr. Peters' claim was reassigned to Prudential employee, Kelly Crocker, who provided Mr. Peters' with another letter requesting his specific dates of availability for a neuropsychological IME and whether he required transportation to and from same.

65. Ms. Crocker set the wheels in motion to terminate Mr. Peters' claim by the pre-ordained date of July 31, 2017.

66. By correspondence dated April 14, 2017, Mr. Peters received a letter from PsyBar, a third-party vendor paid by Prudential to identify suitable neuropsychologists to perform cognitive evaluations and coordinate testing dates.

67. That correspondence instructed Mr. Peters to attend a day-long, insurance neuropsychological evaluation on May 23, 2017.

68. By correspondence dated April 26, 2017, Mr. Peters objected to the use of

PsyBar's participation in the evaluation of his claim based on, *inter alia,* PsyBar's marketing boasts to long term disability carriers, such as Prudential, that PsyBar can reduce insurance claim liability by 70%.

69. By correspondence dated May 6, 2017, from MES Solutions, a third-party vendor paid by Prudential to identify suitable neuropsychologists to perform cognitive evaluations and coordinate testing dates, Mr. Peters was instructed to attend a June 23, 2017, insurance neuropsychological evaluation that would last several hours, to be performed by Robert J. Fabiano.

70. By correspondence dated May 9, 2017, Prudential agreed not to use PsyBar in its evaluation of Mr. Peters' claim.

71. By correspondence dated June 12, 2017, Mr. Peters provided Prudential with Dr. Richard J. Perrillo's neuropsychological evaluation and report. That letter requested that the report be sent to Dr. Robert J. Fabiano for consideration in contemplation of his June 23, 2017, insurance neuropsychological evaluation of Mr. Peters.

72. Dr. Richard J. Perrillo's June 1, 2017, report concluded:

> Being CEO requires the ability to be decisive, strategic, and appreciate not only the consequences of one's actions, (cognitive and emotional control), but cultural differences as the company is worldwide. Mr. Peters' position also required, in addition to leadership, the ability for public speaking and the expansion of developing markets throughout the world. Unfortunately, given Mr. Peters' current neurocognitive status he is not able to fulfill requirements of his previous position or any other lateral position as a CEO or high level executive. For example Mr. Peters' reaction time and information processing speed loss would certainly interfere with his ability to be quick on his feet and be decisive. Also, he is not able to sustain even simple attention and vigilance for 15 minutes let alone an 8 to 10 hour day. Complex attention, which requires a working memory component or the ability to solve problems when they present themselves, is only at 4% level, (96% of the general population is above him let alone other executives). Mr. Peters would have never been able to obtain such a high level of engagement had these deficits existed. His profile also shows

significant decreases in his ability for visual details, which would result both in procedural and content errors, which ultimately would negatively affect the outcome of the company. One must be able to compete with other individuals like him but who do not have serious brain dysfunction. In short, and most unfortunately, Mr. Peters returning to work would be inconsistent with company objectives and negatively affect their outcomes. He is unemployable.

73.  Dr. Perrillo further found that:

Mr. Peters has brain impairments that are very vulnerable to acquired brain damage such as Processing Speed at the 65% level, (51% level for demographic adjustment) simple, complex and procedural reaction time at the 13% level for SRT, and the 1 % level for Complex and the 11 % level for Procedural RT with an overall significant decrease in information processing across the cognitive domains at the 26.4 % level and a composite processing speed and RT index at the 13% level. By way of comparison, previously, approximately less than 10% of population would have been more proficient than Mr. Peters. Now with a composite processing speed index at a 13% level, 87% of the population is above him.

74. On June 23, 2017, Mr. Peters sat for the insurance company sponsored neuropsychological evaluation.

75. The evaluation took place at Dr. Fabiano's purported office located at 100 Medical Park Drive, Suite 211, Grand Rapids, MI 49546. This office was located in a partially abandoned building, which had only three cars in its parking lot at 9:00 a.m. on a Tuesday morning, including Mr. Peters' car.

76.  Dr. Fabiano did not arrive in time for the appointment.

77.  An individual named Todd Westfall (hereinafter "Westfall") introduced himself to Mr. Peters and identified himself as a colleague of Dr. Fabiano.

78.  Westfall led Mr. Peters into another room and began administering a cognitive test to Mr. Peters.

79. The test administered by Westfall required Mr. Peters to look at a symbol and then draw the symbol on a piece of paper.

80. While Mr. Peters was in the middle of the initial test administered by Westfall, Dr. Fabiano appeared at approximately 9:15 a.m. and interrupted the test process to interview Mr. Peters.

81. Dr. Fabiano interviewed Mr. Peters for approximately 25 minutes and then is believed to have abandoned the building at approximately 9:35 a.m.  Dr. Fabiano was not seen again by Mr. Peters subsequent to 9:35 a.m. During the brief interview, Dr. Fabiano produced Dr. Perrillo's June 1, 2017, report and stated, "Dr. Perrillo thinks highly of himself.   I am going to have fun reading this."

82. Dr. Fabiano advised Mr. Peters that he had not read many of the records or materials supplied to him because 10% of the people do not show up.

83. Subsequent to Dr. Fabiano's departure, Westfall administered the balance of the initial test and other tests including the:

- Wechsler Adult Intelligence Scale-IV (WAIS-4)
- Wechsler Memory Scale-IV (WMS-4)
- Grooved Pegboard
- Controlled Oral Word Association Test (COWAT)
- Wide Range Achievement Test-IV (WRAT-4)
- Trail Making Test (Trails A and 8)
- Wisconsin Card Sorting Test (WCST)
- Minnesota Multiphasic Personality Inventory-II (MMPl-2)
- Beck Depression Inventory-II (BDl-2)
- Beck Anxiety Inventory (BAI)
- Rey 15 Item Memory Test (Rey 15 Item)
- Test of Memory Malingering (TOMM)

84. Near the end of the testing, Mr. Peters was provided with a multiple choice questionnaire consisting of approximately 100 questions.

85. Westfall abandoned the building subsequent to handing Mr. Peters the

multiple choice test.

86. Upon completion of the multiple choice test, Mr. Peters provided his written responses to a receptionist.

87. Westfall's credentials are unknown to Plaintiff.

88. Cognitive batteries of the types listed above are not designed to be administered by uncredentialled individuals.

89. For the neuropsychological evaluation to be valid, a subject's behavior must be observed and evaluated by a qualified individual while undergoing the cognitive batteries of the types listed above.

90. Further, the neuropsychological tests administered by Westfall purposefully tested Mr. Peters in the domains of cognitive performance where he was strongest and utterly neglected to test those areas where Mr. Peters had historically performed poorly such as in the domains of sustained attention (impaired on both the Weiss and Perrillo evaluations), selective attention (impaired on Perrillo evaluations) and reaction time (impaired on both the Weiss and Perrillo evaluations).

91. Westfall's failure to test Mr. Peters in the domains of cognitive function where he had previously shown deficits was done to accentuate the positive and eliminate the negative aspects of Mr. Peters' cognitive functioning.

92. Westfall did not sign the June 1, 2017, report.

93. Westfall's name does not appear in the June 1, 2017, report.

94. Dr. Fabiano signed the June 1, 2017, report.

95. Dr. Fabiano concluded that Mr. Peters' diagnosis "[w]ould be that of a Mild Neurocognltive Disorder (294.10) and Adjustment Disorder with Anxiety and Depressed Mood (309.28)."

96. Dr. Fabiano's report also diagnosed Mr. Peters as suffering from "Mild Neurocognitive Disorder Secondary to Cerebral Infarct."

97. The ICD-9 Code "294.10," above, is the code for "[d]ementia in conditions

14

classified elsewhere without behavioral disturbance."

98. Despite diagnosing Mr. Peters with a dementing condition and mild neurocognitive disorder, Dr. Fabiano, concluded that Mr. Peters' "[t]est results were entirely normal from my examination standpoint," and that Mr. Peters was "[n]ot functionally impaired from a cognitive standpoint."

99. By correspondence dated September 5, 2017, Dr. Fabiano responded to Prudential's request to disambiguate his contradictory findings that Mr. Peters' test results were entirely normal yet found he suffered from a mild neurocognitive disorder and a dementing process. Dr. Fabiano dissembled, stating:

> The Neuropsychological evaluation was entirely normal across measures of intellectual, memory and cognitive functioning. However, given the documented stroke in the examinee's subjective complaints, I believe that he does meet criteria for a Mild Neurocognitive Disorder, which has likely improved.

100. The American Psychiatric Association describes "Mild Neurocognitive Disorder" as "[g]o[ing] beyond normal issues of aging. It describes a level of cognitive decline that requires compensatory strategies and accommodations to help maintain independence and perform activities of daily living."

101. In response to Prudential's question whether Mr. Peters' reported issues of fatigue were consistent with what he observed during his evaluation, Dr. Fabiano wrote on September 5, 2017, that he "[d]id not observe nor evaluate any issues of fatigue with regard to our evaluation, which consisted of approximately four-five hours of psychometric testing."

102. Dr. Fabiano September 25, 2017, correspondence deliberately misrepresented that he was present during the entire four to five hours of testing when, in fact, he was only present for 25 minutes. Additionally, it misrepresented the length of the neuropsychological testing, which was only about 3.5 hours, from 9am to 12:30pm.

103. To further evaluate Mr. Peters' claim, Prudential, again, enlisted the

services of PsyBar.

104.　　By correspondence dated October 16, 2017, Mr. Peters reminded Prudential of its May 9, 2017, promise not to use PsyBar to evaluate his claim.

105.　　Prudential once again discontinued the use of PsyBar and requested that certain test results and raw data be sent to a neuropsychologist, Dr. Edan Critchfield.

106.　　By correspondence dated October 24, 2017, Plaintiff objected to Prudential's use of Dr. Critchfield to evaluate his claim on the basis that his license in the State of Texas had expired on August 31, 2017.

107.　　By facsimile dated October 25, 2017, MES Peer Review Services provided Mr. Peters with a copy of Dr. Critchfield's valid Texas license.

108.　　In an undated report commissioned by Prudential through MES Peer Review Services on October 9, 2017, Dr. Edan Critchfield reviewed the neuropsychological evaluations of: Dr. Richard Weiss, Dr. Richard Perrillo, Dr. Robert Fabiano.

109.　　Dr. Edan Critchfield noted "[t]hat the scores across the three evaluations [Weiss, Perrillo & Fabiano] appear relatively consistent."

110.　　Dr. Critchfield also concluded that Mr. Peters' performance on Dr. Fabiano's evaluation may have been elevated due to the temporal proximity of Fabiano's evaluation to Perrillo's earlier evaluation. This is known as the "practice effect."

111.　　Based on his review of all three neuropsychological evaluations, Dr. Critchfield opined that Mr. Peters' diagnosis was "Mild Vascular Neurocognitive Disorder."

112.　　To be diagnosed with "Mild Vascular Neurocognitive Disorder," a person must satisfy the criteria of a "Mild Neurocognitive Disorder" (a level of cognitive decline that requires compensatory strategies and accommodations to help maintain independence and perform activities of daily living) with the added criteria that the onset of the cognitive decline is related to a cerebrovascular event.

16

113.     In reaching this diagnosis, Dr. Critchfield disregarded the findings of Drs. Weiss and Perrillo and relied upon Dr. Fabino's evaluation, which was compromised and invalid due in part to the fact that an uncredentialled individual administered Fabiano's tests and also due to the practice effect.

114.     Despite his determination that Mr. Peters suffered from "Mild Vascular Neurocognitive Disorder," Dr. Critchfield opined that Mr. Peters has "[n]o evidence of psychological or cognitive deficits of a severity to warrant any occupational restrictions or limitations," and thereby adopted the conclusion Dr. Fabiano's evaluation.

115.     Prudential denied Mr. Peters' long term disability claim by correspondence dated December 15, 2017 (hereinafter, the "Termination Letter.").

116.     The Termination Letter endorsed Mr. Peters' description of the material and substantial duties of his own occupation as President and CEO of GENCO as requiring exceptional organizational, reading and communication skills, cerebral dexterity, memory, and tremendous mental and physical stamina to withstand the intense pressure of running a subsidiary of a "Fortune 100" company with approximately 14,000 employees in a very competitive environment.

117.     Specifically, the Termination Letter provided:

> The job description you provided indicates that your job required "exceptional organizational, reading and communication skills, cerebral dexterity, memory and tremendous mental and physical stamina to withstand the intense pressure of running a subsidiary of a "Fortune 100" company in a very competitive environment." You further report you would typically work 55 hours a week not including travel which consisted of ten to fifteen flights a month. You noted you were on-call 24 hours per day, seven days a week to address emergencies and important business that arose around the world. You reported twelve main components of your job which were: setting commercial strategy and direction; modeling and setting the company culture; building and leading the senior team; securing and allocating capital; leading major sales and solutions projects; developing and improving relations with major customers and prospects;

> oversight of operations; setting human resources direction; ensuring legal and regulatory compliance; financial reporting and accountability; public relations; and travel.
>
> ***
>
> A vocational review noted that the reporting of your job duties and travel is completely consistent with the how the occupation is performed in the national economy reporting and accountability; public relations; and travel.

118.    The Termination Letter parroted the findings of Drs. Weiss, Perrillo, Fabiano, and Critchfield, among others, and simply concluded, without further analysis of why somebody who suffers from mild neurocognitive disorder could perform an occupation which required tremendous mental stamina and stated:

> Consistent with Dr. Fabiano's evaluation, from a neuropsychological perspective there is no evidence of psychological or cognitive deficits of a severity to warrant any occupational restrictions or limitations.

119.    Defendant's Termination Letter ignored medical information and records that supported Mr. Peters' claim, relied exclusively upon the flawed, unsupported, and conclusory assertions of an invalid neuropsychological evaluation to deny Mr. Peters' claim and failed to state why Mr. Peters' claim was being denied when his three neuropsychological evaluation scores were "relatively consistent."

## III.    CAUSES OF ACTION

### A.  Breach of Contract

120.    Plaintiff incorporates by reference paragraphs 1 – 119 as though fully set forth herein.

121.    Plaintiff was a participant in and eligible for benefits under the Policy.

122.    Plaintiff complied with each and every term of the Policy.

123.    Without just cause or excuse, Defendant ceased paying benefits to Plaintiff to which he is entitled under the terms of the Policy.

124.    As a consequence of Prudential's breach of contract, Plaintiff suffered damages, to wit:

    a.  Loss of monthly indemnity for each month that he has been disabled, beginning December 15, 2017, in an amount to be determined by proof at trial;

    b.  Loss of funds and the use of funds used to pay premiums to keep his policies in force during a period of disability after Defendant denied payments and cancelled its waiver of premium benefit, beginning in January of 2018 through the start of trial in an amount to be determined by proof at trial.

**B.  Breach of the Obligation of Good Faith and Fair Dealing**

125.    Plaintiff incorporates paragraphs 1 – 124 as though fully set forth herein.

126.    Defendant had no reasonable basis to delay and deny the payment of benefits due under the Policy.

127.    In delaying and denying benefits to Plaintiff under his disability policy, Defendant knew that it was acting without a reasonable basis in its investigation and evaluation of Mr. Peters' claim.

128.    Defendant failed to conduct a reasonable investigation of Plaintiff's claim, and instead conducted an investigation that was outcome-focused on finding a plausible basis to deny Plaintiff's claim.

129.    Defendant failed to objectively evaluate facts, including ignoring facts that supported Plaintiff's claim for disability benefits.

130.    Defendant misrepresented facts that supported Plaintiff's claim.

131.   Defendant failed to give appropriate weight to the opinions of Plaintiff's treating doctors.

132.   In all aspects of investigating or evaluating Plaintiff's claim for benefits under the Policy, Defendant failed to give Plaintiff's interests at least as much consideration as its own and instead elevated its own interests above that of Mr. Peters.

133.   Defendant failed to reasonably or fairly investigate Plaintiff's claim, failed to take reasonable measures to ensure the ongoing payment of Plaintiff's claim, and deliberately conducted a biased investigation for the wrongful and purposeful intent to avoid paying Plaintiff's monthly total disability benefits owed.

134.   Defendants have intentionally created and fostered the existence of a conflict of interest between its employees who handle and process disability insurance claims, including Mr. Peters', and its insureds who submit such claims, thereby encouraging and promoting an environment within its claims operation where Defendants' claims staff acts in an adversarial manner to the interests of its insureds, including Defendant's in-house doctors, who are willing to engage in the creation of biased medical opinions.

135.   Defendant has acted, and continues to act unreasonably, in relying on non-treating and non-examining personnel who are not qualified to render medical opinions regarding Plaintiff's condition and have acted and continue to act unreasonably by denying Plaintiff's claim without a medical foundation for doing so.

136.   Upon information and belief, Defendant specifically targeted Plaintiff's claim for closure because it is an expensive own-occupation disability policy of the type that Defendant has historically targeted for closure.

137.   Defendant has designed a scheme whereby it rejects the well-founded opinions of its insureds' treating doctors by avoiding the use of outside, independent medical evaluations and utilizing in-house doctors who can be predicted to provide opinions that will give support to claim decisions that are adverse to the interests

of insureds.

138.    Defendant has intentionally engaged in insult and personal abuse of Plaintiff by accusing him of exaggerating and overstating his cognitive symptoms and other complaints and suggesting that Plaintiff has falsely claimed that his medical conditions have disabled him from his occupation.

139.    Defendant engaged in these improper acts specifically knowing that Plaintiff was financially and emotionally vulnerable, and consciously disregarding a substantial risk of significant harm to Plaintiff.

140.    Defendant denied Plaintiff's benefits knowing that Plaintiff's claim was valid and payable.

## IV.    PRAYER FOR RELIEF

141.    Wherefore, Plaintiff requests a trial by Jury, and seeks damages against Defendant as follows:

a. An award of all past due benefits and unwaived premium payments from December 5, 2017, through trial in an amount to be determined according to proof, inclusive of interest thereon, as provided by law and as adjusted for cost of living allowances, as provided by contract;

b. An award of future damages based on the value of benefits that would be received throughout Plaintiff's life pursuant to the Policy, as damages for Defendants' tortious breach of the obligation of good faith and fair dealing;

c.    An award of past, present, and future damages for physical suffering, emotional distress, humiliation, inconvenience, and anxiety as a result of Defendant's tortious breach of the obligation of good faith and fair dealing, as previously set forth herein;

d.    Reasonable attorneys' fees pursuant to A.R.S. § 12-341.01 and taxable costs;

e. punitive damages in an amount sufficient to punish and deter the bad faith

conduct described herein, as a result of Defendant's tortious breach of the obligation of good faith and fair dealing; and

      f.     Such other relief as may be provided by law.

136.   Pursuant to Fed. R. Civ. P. 38(b) Plaintiff demands trial by jury.

DATED this 9th day of April, 2018.

DAWSON & ROSENTHAL, P.C.

By /s/ Steven C. Dawson
     Steven C. Dawson
     Anita Rosenthal
     Sander R. Dawson
     Attorneys for Plaintiff